# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Montes, 2013 IL App (2d) 111132**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AUGUSTINE T. MONTES, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-1132 |
| Filed | June 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions *in absentia* for attempted first-degree murder and aggravated discharge of a firearm were upheld where defendant was properly admonished about a trial *in absentia,* the trial was scheduled when he was in court, he failed to appear for trial and offered no explanation, an audio recording of the offenses made by an informant was properly admitted as substantive evidence, the jury was properly allowed to review a transcript of the recording, and the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 05-CF-2797; the Hon. T. Jordan Gallagher, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Matthew J. Haiduk, of Geneva, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    On May 5, 2010, defendant, Augustine T. Montes, was convicted *in absentia* of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2004)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2004)). Defendant filed four motions for a new trial. On February 4, 2011, the trial court denied defendant's posttrial motions and sentenced him (defendant was present at sentencing) to 26 years' imprisonment for attempted murder and a concurrent 10-year term for aggravated discharge of a firearm.

¶ 2    Defendant appealed and, on October 15, 2012, we granted the State's motion to dismiss the appeal for lack of jurisdiction. *People v. Montes*, 2012 IL App (2d) 111132-U. On January 30, 2013, however, the supreme court, under its supervisory authority, directed us to vacate our order and to consider defendant's appeal on the merits. *People v. Montes*, No. 115244 (Jan. 30, 2013). We do so now.

¶ 3    On appeal, defendant argues that: (1) the trial court erred in trying him *in absentia*; (2) the court erred in admitting substantively an audio recording of the crime; (3) the court erred in allowing the jury to review a transcript as an aid in understanding the audio recording; and (4) the evidence was insufficient to establish his guilt beyond a reasonable doubt. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND
¶ 5                            A. *In Absentia* Admonishments
¶ 6    On February 22, 2006, an amended indictment charged that, on November 22, 2005, defendant took a substantial step toward committing murder, by personally discharging a firearm at Julian Ramos. Further, defendant was charged with aggravated discharge of a firearm, in that he discharged the firearm in Ramos's direction.

¶ 7    On December 22, 2006, defendant appeared before the court, entered a not-guilty plea, waived formal reading of the indictment, and reserved his right to a jury trial. At that time,

the court admonished defendant that he had rights to trial by court, trial by jury, and counsel, as well as the right to confront the witnesses against him. The court further admonished that: "If you fail to appear at any scheduled court hearing, that would be considered as a waiver of your right to confront the witnesses against you and that hearing could proceed in your absence." When asked if he understood those rights, defendant answered, "Yes, your Honor."

¶ 8        On March 12, 2007, defendant posted bond and signed a certificate that stated that he understood that the terms and conditions of his bond included that, if, at any time prior to the final disposition of the charges, he failed to appear in court when required, the result would be a waiver of his right to confront witnesses against him and "the trial can proceed in [his] absence."

¶ 9        Thereafter, defendant appeared at the majority of scheduled court hearings, including on January 14, 2010, when the court continued the case to April 30, 2010, with a jury trial scheduled to commence three days later, on May 3, 2010. On April 30, 2010, however, defendant did not appear in court. Defense counsel informed the court that he had been meeting regularly with defendant, but that defendant did not appear at their last scheduled meeting. Counsel stated that he had sent defendant a letter, telling him to appear in court on April 30, 2010, and that he had fully expected defendant to be present. Counsel asked for a continuance, stating that he did not know where defendant was and that defendant might be in custody somewhere. Counsel further represented that defendant was not, however, in custody with the Kane County sheriff's department.

¶ 10        The assistant State's Attorney informed the court that, when defense counsel alerted her to the fact that defendant did not appear to meet with him, she ran a new "rap sheet" to learn whether defendant had been "picked up"; there was no arrest reflected thereon. She informed the court that, since defendant's last court appearance (in February 2010), a grand jury had indicted defendant for delivering, on two different occasions, cocaine to a narcotics task force officer. There was an outstanding warrant for defendant's arrest in that case; the assistant State's Attorney explained that, for more than one month, the police had been unable to arrest defendant and, so, perhaps he had left the area. The State wished to proceed with trial on May 3, 2010, even if defendant did not appear. The assistant State's Attorney showed the trial judge the transcript from defendant's arraignment, wherein he was admonished regarding a trial *in absentia*. The State noted that it had witnesses ready, including a witness who would be coming in over the weekend from out of state.

¶ 11        The court reviewed the transcript and stated, "[f]or the record, I guess this language would be sufficient to make a finding that [defendant] was on notice of the potentiality of a trial *in absentia*." Further, the court noted that defendant was present on the court date when the trial date was scheduled. Defense counsel noted that the admonishment stated only that a "hearing" could be conducted in defendant's absence and not, per section 113-4(e) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/113-4(e) (West 2004)), that a "trial" could proceed in defendant's absence. Defense counsel asked for a continuance. The court replied that it had "noticed that the language used was the word hearing as opposed to trial, but I still think that it covers the necessary admonishment about trial *in absentia*." Accordingly, the court denied the request for a continuance and ordered that trial would proceed, as scheduled, the following Monday.

¶ 12                                    B. Trial

¶ 13       On Monday, May 3, 2010, defendant did not appear, and trial proceeded in his absence.

¶ 14                                 1. Officer Hornback

¶ 15       Officer Danny Hornback testified that, on November 22, 2005, at around 12:30 p.m., he responded to a call that shots were fired in a residential area near 191 North Calhoun Street in Aurora. While en route to that location, Hornback was advised via radio that the intended victim, Julian Ramos, had run from the location of the shooting and was now in the area of Farnsworth and Liberty Streets. Hornback arrived there and found Ramos inside a pickup truck, hiding below the dashboard. Ramos was visibly shaken, but not injured. Ramos explained that someone shot at him three or four times. He reported seeing four people in a green, four-door Pontiac Bonneville. Only one person, the shooter, exited the vehicle. The shooter was primarily dressed in black with a white, hooded sweatshirt. Hornback and Ramos returned to the scene, but did not find any shell casings or a weapon. Hornback asked Ramos if he knew why someone might want to shoot him. Ramos replied that it might be in retaliation for a shooting that he had been involved in a couple of years prior. Hornback asked neighbors if they saw anything, and they did not. Hornback took Ramos home.

¶ 16                                  2. Victim Ramos

¶ 17       Ramos testified that, on November 22, 2005, he was walking to his girlfriend's house when he saw a green Pontiac Bonneville pass him. Ramos testified that he saw three Hispanic men and one African-American man in the car (although, on cross-examination, he testified that he could not tell if the vehicle's occupants were male or female). Ramos noticed someone get out of the car and, so, he began to run; shortly thereafter, when he looked over his shoulder, no one was there. Ramos believed that something was suspicious, so he kept running. Ramos said he was not paying close attention "at all" to what the person was wearing, but when he "just glanced over" he saw a black, hooded sweatshirt. Ramos continued to run and then began walking quickly down various streets.

¶ 18       Ramos came to a corner and saw the green Bonneville at a gas station. At that time, he saw only the driver, an African-American male wearing a white, hooded sweatshirt, in the car. Ramos froze, but then began running. At some point, he turned around and saw someone about 35 to 40 feet away pointing a gun at him. The person holding the gun was wearing a black "hoody"; Ramos explained that it was a baggy sweatshirt and the hood was over the person's head, so he could not see his or her face. He could not tell if the person was male or female. The person was heavyset and likely weighed around 230 pounds. Ramos agreed that he did not provide this description to Hornback at the time of the incident. Ramos saw a gun and then turned around and heard "shots fired"; he started running and screaming "I ain't no King." Ramos continued running, jumped a fence, and ran onto a busy four-lane street asking for help. A man in a white truck stopped and allowed Ramos to climb into the truck. Ramos was asked how many shots he heard, and he replied, "One. No more than one." Ramos knew the sound to be a gunshot, as he had heard gunshots before.

-4-

¶ 19                                3. FBI Agent Camacho

¶ 20        Special agent Larissa Camacho testified that she is employed by the FBI and is currently assigned to run the informant program at the FBI's Chicago office. In 2005, she was assigned to the West Suburban Violent Gang Task Force. In early 2005, Camacho was familiar with the Aurora Latin Kings street gang and received information about a potential cooperator named Blake Pannell. At the time, Pannell was serving a sentence in the Department of Corrections. After interviewing Pannell, the FBI decided to use him as an informant. Camacho explained that it is very difficult for an outsider to infiltrate a gang; therefore, it is useful for the FBI to have as an informant someone who is already a trusted member of the gang. Pannell's agreement to cooperate with the FBI (as well as the Aurora police department and Kane County sheriff's office) included his truthful admission to his past crimes and a willingness to testify before grand juries in federal and state courts. Further, Pannell agreed to wear a recording device and have it with him the majority of the time. Pannell was released from prison and placed on probation. Although Pannell admitted to his involvement in 16 or 17 shootings (including one wherein he was the shooter and killed someone), selling narcotics, and other gun crimes, he was essentially given immunity and was never charged with those crimes. In addition to testifying against other gang members, the agreement required Pannell to follow the law. Pannell was "absolutely" supposed to avoid participating in violent activities, "if he could avoid it." The Latin Kings were restructuring and, so, at the FBI's request, Pannell sought and became the gang's "enforcer."[1]

¶ 21        Camacho was Pannell's "handler" and they spoke "very often." Camacho gave Pannell a recording device. She agreed that Pannell was responsible for operating the device and could control when he turned it on and off. Pannell was supposed to call Camacho and tell her if he was going to turn on the device, "and he would, yes, sir. [Pannell] was very good about calling me when there was–when it was warranted as far as the recordings were concerned." However, as the "hood enforcer," he was also given permission to use his judgment to determine when the recorder should be turned on, particularly in an emergency. After a recording, Camacho would take the recording device off of Pannell's person and take it to be downloaded. Pannell's first recordings were of monitored drug purchases. Pannell proved himself trustworthy. Then, with the goal of recording confessions made by a shooter, Pannell began recording shootings. When asked to describe the recording device, Camacho explained: "Technically, I'm not supposed to record the device, based on our FBI rules and procedures, but let's just say it was–it's not anything that you would see on TV that would cause anyone to think that it's this huge device that would be revealing; but it was small enough to not compromise [Pannell]'s safety considering I'm actually giving him the device and I'm not with him." Further, Camacho explained that, if she or other agents were to follow Pannell, she would endanger his life because gangs are surveillance-conscious.

_____

[1]The enforcer was responsible for making sure the gang members behaved according to the gang's rules; if they did not, they could be beaten or killed. The FBI wanted Pannell in that role because he would have control over the gang's guns, and it was trying to prevent more violence.

¶ 22     On November 22, 2005, Pannell called Camacho and sounded panicky; he said he did not have much time to talk, but he was in a car with other people and there was something going on that was not good, and he would call her back as soon as he could. Pannell did call her again later and she met with him. Camacho agreed that Pannell had been involved in "many, many bad things," and that she had known him only around three months; however, in her opinion, she did not believe that Pannell was panicky because he had been involved in smoking marijuana or spray painting buildings. Rather, she believed he was panicked because there was a gun in the car and he thought that someone might get killed. On November 22, 2005, Camacho took Pannell's recording device off of him and listened to its contents.

¶ 23     Camacho was familiar with members of the Aurora Latin Kings, and, after identifying photographs of defendant, Quentin Moore, and Ruben Hernandez, she confirmed that they were all Latin King gang members. Pannell made approximately 15 recordings for the FBI between September and November 2005. The recording at issue in this case was his final recording because, shortly thereafter, he had a dispute with his girlfriend and it was revealed in front of a police officer that he had been cooperating with the FBI. Concerned for Pannell's safety because his identity was compromised, the FBI decided to "pull" Pannell as an informant. In total, the federal government paid Pannell approximately $20,000; part of that money was for his services, but part involved relocating him to protect his safety. Camacho agreed that the FBI also paid for Pannell's tattoo-removal treatments, as well as transportation costs whenever he returned to testify. Pannell's agreement with the FBI did not terminate on account of his smoking marijuana, his spray painting buildings, or his domestic battery arrest in November 2005. Camacho agreed that, in light of the foregoing, Pannell was "apparently" not always truthful.

¶ 24                              4. Informant Pannell

¶ 25     Pannell testified that he grew up in Aurora and lived there until 2005. In 2000, at age 20, he became a member of the Latin Kings by committing multiple shootings. In 2004, while serving a sentence for residential burglary and aggravated fleeing and eluding, police came to discuss with Pannell a murder in which they had heard he was involved. At that time, it became apparent to Pannell that members of his gang were providing information about him to the State, which "bothered" him. Pannell agreed to cooperate with authorities. In turn, Pannell's prison sentence was vacated, he was released, and his conviction was reduced from a nonprobationable to a probationable offense. Further, another felony was removed from his record; his driver's license, which had been revoked, was returned; he received money; and he received immunity for his past crimes, including a murder.

¶ 26     On cross-examination, defense counsel thoroughly explored Pannell's past crimes, the benefits he received through his cooperation, and the fact that it was upon his word that the State was asking the jury to believe who said and did what on the night of the offense. Pannell agreed that, before he began cooperating with law enforcement, he committed "a lot of very violent crimes." Because informants against Latin Kings are killed, the government relocated Pannell after he was arrested in late November 2005 for domestic battery and, in

the investigation thereof, his identity was compromised. Since being relocated, Pannell has been called back to testify four or five times, and the government pays for his traveling expenses.[2] In total, Pannell estimated that he had been paid approximately $30,000 for his work with the authorities, and he was given the use of an automobile prior to buying his own (with money he received from the government).

¶ 27    The FBI gave Pannell a recording device, and he agreed to activate it to get evidence regarding past crimes and to record current crimes. On November 22, 2005, Pannell took his car to an auto repair garage. Latin King member Quentin Moore picked him up at the garage in Moore's green Bonneville. Defendant and Ruben Hernandez, also Latin King members, were in the car. Moore drove, while Hernandez sat in the front passenger seat; Pannell sat in the back behind Moore and defendant sat in the back behind Hernandez. The four men carried spray paint to cover graffiti that rival gangs had painted in Latin King territory. Pannell knew that the spray painting, called "tagging," constituted vandalism and was considered illegal gang activity. The men wore gloves and hooded sweatshirts, so that they could cover their heads and faces with the hoods while working. Pannell could not recall the color of his sweatshirt. Moore had a gun in the car; it was a 9-millimeter Beretta, which is a semiautomatic handgun. At some point, they stopped briefly at a friend's home. Pannell turned on his recording device.

¶ 28    While they were painting, defendant noticed a man on foot (Ramos) whom he believed to be a member of the Insane Deuces, a rival gang. The men began plotting how to catch up with the man to shoot him; Pannell, however, was not plotting, because he was working with the government. Moore parked in an alley so that defendant could get out of the car and catch up with Ramos. Hernandez gave defendant the gun, and defendant put it in his sweatshirt's outside pocket. Pannell, Moore, and Hernandez stayed in the car while defendant exited; however, Moore noticed some graffiti and Pannell got out to cover it. As Pannell finished and returned to the car, defendant returned also. They got back in the car, and defendant related that, when Ramos had noticed him coming with his hood up, Ramos got scared and ran off. Defendant said he knew exactly where Ramos was heading, and he then instructed Moore on how they could drive to catch up with him. Defendant wanted to get to a location and park, so that they could ambush Ramos when he arrived.

¶ 29    Defendant wiped the gun with a towel, threw it on the middle backseat, and put the towel over it. Pannell, sitting on the other side, reached over and, through the towel, pushed a button on the gun to remove the clip that holds the ammunition; he dragged the clip out and stuffed it between the seat cushions. While Pannell explained that he did not know if a bullet was still in the gun's chamber, by removing the clip he removed any other bullets. He did so because he did not want anyone killed. When they arrived at the second location, defendant grabbed the gun, put it in his sweatshirt pocket, and exited the vehicle. Pannell saw defendant stand between two houses until Ramos appeared.

¶ 30    At that point, Pannell's cell phone, which was located in the same area as the gun clip,

---

[2]Apparently, after he was relocated, Pannell used cocaine, went to rehabilitation, and was jailed for driving under the influence.

began to ring. When Pannell reached to pick up his phone, he noticed that Hernandez was looking back at him. Pannell thought that Hernandez saw the clip, so he grabbed it and said "[defendant] doesn't have the clip." Hernandez told Pannell to go give it to defendant, in case Ramos, whom they believed to be an Insane Deuce, had a gun and tried to open fire on defendant. Pannell exited the car while Hernandez began trying to call defendant to let him know he did not have the clip. About the same time, Ramos appeared, and defendant came out and fired at him. Pannell heard the gunshot and saw defendant fire. Pannell, holding the clip, started running across the street toward defendant, calling defendant's name. Ramos was running away, screaming, "I'm not a King, I'm not a King, I'm not a King." Pannell met up with defendant and said to him, "you have no clip, you have no clip," and they ran back to the car.

¶ 31    When they got inside the car, defendant said, "I almost had him. I almost had him." Hernandez said to defendant that "you better finish this since he's seen us. You better kill that person." They began driving to find Ramos, and defendant was going to "just gun him down." As they neared a busy street, they saw that Ramos had stopped traffic and was in the middle of the street; because there were several vehicles stopped on a major road, at 12:30 p.m., they abandoned Ramos and left to hide. They went to a friend's home where they smoked marijuana, defendant showered, and they waited for time to pass. Later, Pannell was dropped off at another friend's house. Pannell telephoned Camacho, who met him at another location. Pannell gave Camacho the recording of the shooting.

¶ 32    Pannell testified that, while he knew that graffiti and smoking marijuana were illegal, his refusal to do so would have raised flags with the other gang members because to them those things were such small crimes that not participating would have been suspicious. Pannell explained that, if the Latin Kings found out he was an informant, he would have been killed.

¶ 33    The court recessed. Outside the jury's presence, the court explained its understanding that the next part of Pannell's testimony would lead to the introduction of the oral recording he testified he made. The State explained that it did not plan to play the entire recording and that, in addition to the recording, it had a transcript for the jurors. The transcript was of the entire recording, but the State planned to direct the jurors to the point in the transcript where it was starting the recording.

¶ 34    Defense counsel objected. First, he argued that the recording was incomplete and that he had never seen or heard the complete tape; he argued that someone, who remained unidentified, had deleted portions, claiming they were irrelevant, which was reflected at least three times in the transcript. Also, counsel argued, the transcript contained portions that were highlighted by bold print, and numerous points were noted as unintelligible and with unidentified speakers. Further, counsel objected to a lack of foundation for the recording. He argued that the only evidence presented was that Pannell wore a body recorder, but that Camacho had not described the equipment, what technique was used, how the recording was transferred to a CD, or any chain of custody or provided any other authentication. Also, counsel argued, there was no foundation or authentication for the transcript. Counsel argued that there was no evidence regarding who prepared it and the process used to do so.

¶ 35    The State disagreed, arguing that Pannell could authenticate the recording because he had

listened to it and could testify that the recording reflected what happened that day. As for the transcript, the State argued that it could "use whatever type of transcript" it wanted, and, if the defense did not like it, counsel could make arguments about it. It explained that it planned to stop the recording at various points to ask Pannell the identities of the voices being heard. Finally, the State noted that there were a couple of different recordings, the original recording and an enhanced version, and that both had been tendered to the defense. The State indicated that someone with the FBI, not the State's Attorney's office, prepared the transcript.

¶ 36    The court noted that an unidentified person made the transcript and that there were changes made to the transcript between discovery and trial; accordingly, when people "are picking and choosing what's going in there," the transcript might not be accurate. However, the court noted that the recording, not the transcript, was the evidence. It ruled that it would not allow the transcript into evidence, but it would allow the jury to follow along in the transcript while listening to the recording. "As soon as it's over, I'm taking it back from them. It's not going back with them." In response to the State's request that the entire recording go into evidence, even though it planned to play only portions of it, the court agreed that "the tape will go into evidence. I don't have any problem with that because [Pannell's] going to authenticate it, right? *** Based on that, that will be enough sufficient foundation as far as the court [*sic*]."[3]

¶ 37    The court further noted that there was an original conversation that was hard to hear, and then another copy of the recording that was "cleaned up" to make it easier to hear. Defense counsel again noted that, in the transcript being provided to the jury, there was occasional bolded text, highlighting portions of the transcript. The court agreed, but noted that "it's not going to go to them. They are only going to be reading it as we go along. I do not like the highlighting. If it was going back to the jury, that would be reason not to send it back. But since it's not going to go back with them, I'm going to allow it over your objection ***."

¶ 38    Pannell returned to the stand and the jury was brought back in. The court informed the jury that portions of an audio recording would be played, that it would be stopped and started as necessary so that the jury did not have to sit through a 1.5-hour tape, and that the transcript was simply an aid while listening to the recording. The court allowed the State to distribute the transcript to the jurors and to direct the jurors to the transcript pages as the recording played. Later, the court collected the transcripts.

¶ 39    Before starting the recording, the State asked Pannell if, "prior to coming in to court today and at times in the past, [he had] had occasion to listen to the tape recording?" He replied, "yes." The State asked if the recording was "an accurate recording of the conversations that you recorded that day?" Again, he replied, "yes." Pannell explained that

---

[3]When the State informed the court that it intended to play only portions of the recording, it nevertheless noted that it wanted the entire recording admitted into evidence. "If that's going to be objected to, then we'll play the whole tape. I don't think there is a reason for them to have to sit in open court and listen to the whole thing because there's a lot of, you know, music, chatting." Defense counsel did not object to the playing of only portions of the recording during trial.

several portions of the recording were inaudible because the recording device was underneath his clothing. The recording was played, beginning with page one of the transcript, reflecting when Pannell turned on the recording device. The State then directed the jury and Pannell to page 30 of the transcript and played that portion of the recording. The State asked Pannell what was happening at that time. Pannell explained that he was outside of the vehicle, spray painting, and that the static heard on the recording reflected his movement.

¶ 40 Next, someone on the recording, whom Pannell identified as defendant, spotted Ramos and said "he's a Dukie," which is a derogatory slang word for Deuce. Pannell identified a voice that said "Damn, then he'll see my face" as defendant's voice. He identified a voice that said "You want a bandana" as Hernandez's. He also identified a voice that said "You look like a bank robber" as his own. Pannell explained that, when defendant got out of the car the second time, after originally seeing Ramos, he wore over his face a black bandana that Hernandez had handed to him. Once he put it on, one could see only defendant's eyes and part of his forehead. Otherwise, defendant's face just appeared black. Pannell identified defendant's voice as saying, "Take a left. I know exactly how to catch him up ***." Pannell identified and explained additional portions of the recording, including when defendant exited the vehicle, the sound of the gunshot, the sound of his own running as he got back into the car with defendant, and defendant saying "I had to bump that 'nigga' " (which means kill him), "it was all over for him," "I was chasin', chasing down the block," and "I kept hearin' click, click, click." Pannell identified the time in the recording when they pulled up at their friend's house and exited the car, the sound of the car doors, and the sound of defendant's voice asking if he could take a quick shower.

¶ 41 Pannell was asked on cross-examination if he was wearing a black, hooded sweatshirt, and he answered, "yes." He was asked if defendant was wearing a white, hooded sweatshirt, and he said, "yes." Also on cross-examination, defense counsel noted that Pannell testified that he was on the phone with his girlfriend before the shot was fired, that Hernandez called defendant to tell him to return to the car because he had no clip, and that they were all directing defendant to return to the car. Further, according to his testimony, after the shot was fired, Pannell exited the vehicle and began running toward defendant, with Pannell holding the clip and defendant holding the gun. Defense counsel then pointed Pannell to a part in the transcript (but did not play the corresponding part of the recording) that said: "Come on hurry up. Give me the clip. Give me the clip. Augustine." Counsel asked who made that statement, and Pannell answered, "without hearing it, I'm not sure." Counsel asked Pannell, if defendant had the gun with no clip, how would defendant be able to give anybody the clip? Pannell answered, "like I said, without hearing it, I wouldn't know. This transcript is not accurately printed out as to what's on the tape."

¶ 42 On redirect, the State played that portion of the recording, and asked Pannell to explain who was speaking. Pannell explained that he could be heard yelling defendant's name (Augustine) and then Hernandez said "Come on hurry up. Give him the clip, Give him the clip." Then Pannell opened the door and started running, yelling "Augustine" as he jumped out of the car. On the recording, he identified the sound of the gunshot and the sound of a door opening. Pannell agreed, however, that while Hernandez said "give him the clip," and he, Pannell, said "Augustine," it appeared on the transcript as though one person said both

-10-

things. Pannell testified that he weighed a little less than 135 pounds at the time of the incident. Defendant, in contrast, was a "much bigger guy."

¶ 43                                    5. Officer Tellner

¶ 44       Officer Dave Tellner was accepted by the court as an expert in gang intelligence. Tellner testified that the Aurora police department maintains a registry of gang members, gang affiliates, and gang activity. He testified that, in 2005, defendant, Moore, and Hernandez were members of the Latin Kings. Tellner had seen defendant in the year preceding trial and identified a State exhibit as a photograph of defendant.

¶ 45       The State rested. The court denied defendant's motion for a directed finding. Defendant offered an exhibit into evidence and then rested. He made another motion for a directed finding, arguing that there was no proof of an intent to murder; the court denied the motion. After closing arguments, the court instructed the jury. The instructions included that the testimony of a person involved in a crime with defendant, *i.e.*, Pannell, should be viewed with suspicion and caution and carefully examined in light of the other evidence.

¶ 46              6. Deliberations, Verdict, and Posttrial Proceedings

¶ 47       During deliberations, the jury came back with a question and wanted to both hear the recording and have the transcript to review. Defendant again objected to the admissibility of the recording and transcript, and the court discussed with the attorneys how to allow the jury to play the recording. The court responded to the jury's question by answering, "[w]e are working on getting the tape to you. I am not going to give you the transcripts." The court sent to the jury a computer and the recording, and asked the bailiff to show the jury how to use them.

¶ 48       The jury returned a verdict of guilty on both counts and signed a special interrogatory, finding that defendant personally discharged the firearm. The court denied defendant's posttrial motions and sentenced him to 26 years' imprisonment for attempted murder and 10 years' imprisonment for aggravated discharge of a firearm. Defendant appeals.

¶ 49                                    II. ANALYSIS

¶ 50                                A. Trial *In Absentia*

¶ 51       Defendant argues first that the trial court erred in proceeding to a trial *in absentia*. Defendant argues that, because the court did not admonish him that a *trial*, as opposed to a hearing, could proceed in his absence, the admonishments were deficient. Defendant argues that a hearing and a trial are not the same thing, as evidenced by the fact that local forms and the Code do not use the terms interchangeably but, rather, use them independently and, at times, even use both words in the same section (*e.g.*, section 108A-8(c), which prohibits the use of evidence obtained via illegal use of an eavesdropping device "in any trial, hearing, or other judicial or administrative proceeding" (725 ILCS 5/108A-8(c) (West 2010))). As such, where defendant was admonished only that a hearing could proceed in his absence, he

contends that his failure to appear at trial cannot be interpreted as a knowing waiver of his right to be present. We disagree.

¶ 52    Trials *in absentia* are generally abhorred because of their inherent unfairness to a defendant. The question of whether a trial *in absentia* violated a defendant's constitutional right to be present at trial is a legal one reviewed *de novo*. *People v. Liss*, 2012 IL App (2d) 101191, ¶ 10.

¶ 53    "The right to be present at trial is of constitutional dimension and can only be waived by a defendant himself." *People v. Lester*, 165 Ill. App. 3d 1056, 1058 (1988). A defendant's voluntary absence from trial may be construed as an effective waiver of his or her constitutional right to be present. *Liss*, 2012 IL App (2d) 101191, ¶ 11. However, a waiver of the right to be present at trial is valid if the record indicates that the defendant was aware of the right he or she was waiving. *Lester*, 165 Ill. App. 3d at 1058. As such, in Illinois, a defendant has a statutory right to be orally admonished regarding the possible consequences of failing to appear in court when required. *People v. Phillips*, 242 Ill. 2d 189, 195 (2011). Specifically, section 113-4(e) of the Code provides that, if a defendant pleads not guilty, the court:

> "shall advise him at that time or at any later court date on which he is present that if he escapes from custody or is released on bond and fails to appear in court when required by the court that his failure to appear would constitute a waiver of his right to confront the witnesses against him and trial could proceed in his absence." 725 ILCS 5/113-4(e) (West 2008).

The court *must* orally admonish the defendant; preprinted bond slips that warn of the possibility of trial *in absentia* are not, alone, sufficient to support a knowing waiver of the right to be present at trial. See *Phillips*, 242 Ill. 2d at 199; see also *People v. Green*, 190 Ill. App. 3d 271, 272-74 (1989); *Lester*, 165 Ill. App. 3d at 1057.

¶ 54    However, the primary purpose of section 113-4(e) is to prevent "bail jumping" and to promote speedy judgment. *Phillips*, 242 Ill. 2d at 196. "To allow a defendant to stop trial proceedings by his voluntary absence would allow him to profit from his own wrong." *People v. Johnston*, 160 Ill. App. 3d 536, 540 (1987). As such, "[a] defendant who is properly admonished that trial might proceed in his absence, has notice of his trial date, and voluntarily fails to appear offering no explanation for his absence may be tried *in absentia*." *Id.*; see also *People v. Lane*, 2011 IL App (3d) 080858, ¶ 22.

¶ 55    Further, while a trial court *must* orally admonish a defendant pursuant to section 113-4(e), only "substantial compliance" with that section is necessary to permit the trial of an absent defendant.[4] See *Liss*, 2012 IL App (2d) 101191, ¶ 17; see also *Phillips*, 242 Ill. 2d at

---

[4]A trial *in absentia* requires compliance with section 115-4.1(a) of the Code, which provides: "When a defendant after arrest and an initial court appearance for a non-capital felony or a misdemeanor, fails to appear for trial, at the request of the State and after the State has affirmatively proven through substantial evidence that the defendant is willfully avoiding

199 (there cannot be "substantial compliance" with the Code where the trial judge did not, in any way, admonish the defendant pursuant to section 113-4(e)).

¶ 56    In *People v. Condon*, 272 Ill. App. 3d 437, 442 (1995), *overruled on other grounds by Phillips*, 242 Ill. 2d at 200-01,[5] the court held that "[s]ubstantial, not perfect, compliance with section 113-4(e) is required to legitimize a trial *in absentia*." There, the defendant first signed a form admonishing him that he had a right to be present at "the proceedings" and that, if he did not appear, he could be "tried" in his absence. Later, the defendant was orally reminded that "the proceedings" could go forward in his absence and that he had an obligation to appear on scheduled court dates. On appeal, the defendant argued that the oral admonition did not satisfy section 113-4(e)'s requirements, because the court stated that the "proceedings" could go forward, not, specifically, that the *trial* could go forward. The court rejected this argument, noting that, even if the oral admonition presumed an understanding of the word "proceedings," the written admonition had specified that the trial could proceed in his absence. Holding that substantial compliance was all that was required, the court determined that the "combination of the written admonition and the oral admonition" constituted substantial compliance because together they sufficiently conveyed to the defendant that, if he did not appear for trial, the trial could proceed without him. *Id.*; see also *People v. Broyld*, 146 Ill. App. 3d 693, 698 (1986) (reversal *not* required where "imperfect admonishment" informed the defendant that a trial could proceed in her absence but not that, by failing to appear, she would be waiving her right to confront the witnesses against her).

¶ 57    Here, defendant was admonished that if he failed to appear at "*any* scheduled court hearing, that would be considered a waiver of [his] right to confront the witnesses against [him] and *that hearing* could proceed in [his] absence." (Emphases added.) Obviously, the better practice would be for trial judges, when giving the section 113-4(e) admonishment, to use the word "trial." However, while the admonishment here was not perfect, in that the court used the word "hearing," instead of "trial," we conclude that it substantially complied with section 113-4(e)'s requirements and sufficiently informed defendant that, if he failed to appear, trial could proceed in his absence. We simply disagree with defendant's argument that, because the words "hearing" and "trial" are sometimes used separately, the words "any hearing," as used here, insufficiently encompassed a trial. To the contrary, we think that, when defendant was admonished that a failure to appear at "any hearing" could result in that hearing proceeding in his absence, he was sufficiently admonished, in substantial compliance with section 113-4(e)'s requirements, that the failure to appear at *any* scheduled court hearing, including a trial, could result in waiver of his rights.

¶ 58    Further, as in *Condon*, defendant here did not receive only an oral admonition. Rather, in *addition* to the oral admonition, defendant signed a bond form, which stated that he must

---

trial, the court may commence trial in the absence of the defendant." 725 ILCS 5/115-4.1(a) (West 2008).
Defendant does *not* argue on appeal that section 115-4.1(a) was violated.

[5]The decision in *Condon* was overruled by the supreme court in *Phillips* only to the extent it suggested that written admonitions, alone, could satisfy section 113-4(e)'s requirements.

appear at all scheduled court hearings and that, if he failed to do so, *trial* could proceed in his absence. Together, the oral admonition and the written bond form sufficiently apprised defendant that, if he failed to appear, trial could proceed in his absence. As such, where defendant was sufficiently admonished that trial could proceed in his absence, he was present at the hearing when trial was scheduled, he did not appear at trial, he offered no explanation for his absence,[6] and efforts to locate him were unsuccessful, the court did not err in proceeding to try defendant *in absentia*.

¶ 59                              B. Foundation for Audio Recording

¶ 60      Defendant argues next that the court committed reversible error where it allowed the jury to consider an audio recording that lacked foundation and was prejudicial. Specifically, defendant contends that the State laid an insufficient foundation and that, to the extent a foundation was established, it was only to admit the recording as a demonstrative exhibit; thus, defendant argues, the court erred in permitting its entry as substantive evidence. For the following reasons, we disagree.

¶ 61      The admissibility of trial evidence rests in the trial court's sound discretion, and we will not reverse its ruling absent an abuse of that discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). An abuse of discretion occurs when the ruling is arbitrary or fanciful or where no reasonable person would adopt the trial court's view. *Id.* "There is no doubt that sound recordings are admissible if they are otherwise competent, material and relevant and where a proper foundation is laid." *People v. Williams*, 244 Ill. App. 3d 669, 673 (1993). An adequate foundation for admission of a sound recording into evidence exists if a witness to the recorded conversation testifies that the recording accurately portrays the conversation in question. *People v. Williams*, 109 Ill. 2d 327, 338 (1985).

¶ 62      Defendant concedes the foregoing, but he asserts that, generally, when a witness testifies that he was present at the time the recording was made and that the recording accurately reflects the conversation, the recording becomes admissible for only *demonstrative* purposes. Here, defendant argues, the audio recording was admitted *substantively* and required additional authentication. Specifically, to admit an audio recording substantively, defendant asserts, the "silent witness" method requires "evidence on the capability of the device for recording, the competency of its operator, the proper operation of the device, the preservation of the recording with no changes additions or deletions, and the identification of the persons, locale, or objects depicted sufficient to make a clear showing of relevance." *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 23; see also *People v. Taylor*, 2011 IL 110067, ¶ 35. Defendant argues that the State here failed to satisfy this standard. We disagree.

¶ 63      We conclude that sufficient foundation existed here such that the trial court's decision to admit the recording as substantive evidence was not an abuse of discretion. In so concluding, we are mindful of the supreme court's decision in *Taylor*, wherein the court stated that, while a court may look to many factors to determine whether a proper foundation has been laid for a recording, "we emphasize that this list of factors is nonexclusive. Each

---

[6]In fact, no explanation for defendant's absence was ever offered below or on appeal.

case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Taylor*, 2011 IL 110067, ¶ 35.

¶ 64 Here, the combination of Pannell's and Camacho's testimonies provided sufficient foundation such that the court's decision to admit the recording was not an abuse of discretion. Specifically, Pannell, a witness to the events, testified that he turned on the recording device given to him by the FBI. We note that the fact that the recording exists evidences that the device was functional and that Pannell knew how to operate it. See *id.* ¶ 39. Pannell further testified that, after the events at issue, he met with Camacho and she personally took the recording from him. Finally, Pannell testified that, prior to coming into court, he had listened to the recording and that it was an accurate recording of the conversations and events that he witnessed and recorded.

¶ 65 Camacho, in turn, testified that she gave Pannell the recording device, although FBI policy precluded her from describing the actual device in detail. She testified that Pannell telephoned her on November 22, 2005, to alert her that something might happen, that he normally called her before he began recording, and that he later telephoned her again to meet with him. That same day, Camacho met with Pannell, removed the recording from Pannell's person, and listened to its contents. Finally, Camacho testified that, after Pannell made a recording, she would take the recording device off of Pannell's person and then take the recording to be downloaded, presumably at the FBI's offices.

¶ 66 It is true that the evidence does not reflect specifically to whom Camacho gave the recording and who transferred the recording to a CD. However, as long as there are other factors demonstrating the authenticity of a recording, a strict chain of custody is unnecessary. *Id.* ¶ 41. "Even if one link in the chain of custody is missing, if there is testimony describing the condition of the evidence when delivered that matches the description of the evidence when examined, the evidence is sufficient to establish a chain of custody." *Dennis*, 2011 IL App (5th) 090346, ¶ 28. Here, defendant testified that he gave the recording to Camacho, Camacho testified that she took the recording from defendant and took it to be downloaded, and defendant testified that he listened to the recording as downloaded on the CD and that it accurately reflected the events he witnessed. Any gaps in the chain of custody go to weight, not admissibility. *Taylor*, 2011 IL 110067, ¶ 41.

¶ 67 We note that "neither in the circuit court nor before this court does the defendant make a colorable claim that the recording is not authentic or accurate." *Dennis*, 2011 IL App (5th) 090346, ¶ 28. Where a defendant does not present any actual evidence of tampering, substitution, or contamination, the State need establish only a probability that those things did not occur. *Id.* Any deficiencies go to the weight, rather than the admissibility, of the evidence. *Id.* We acknowledge that, in argument, the parties and the court discussed the fact that there were two copies of the recording, with one being "enhanced" to provide a cleaner, more intelligible sound. While defense counsel originally suggested that he had not heard the full recording and that portions were deleted by unidentified persons, the State represented that the original and "cleaned up" versions had been produced. Defense counsel thereafter appeared to abandon that claim, focusing instead on the transcript, but we note that counsel

never argued that the recording was actually fabricated or tampered with improperly. In any event, even if portions of the recording here were deleted, the supreme court in *Taylor* held that it is too restrictive to expect that *no* deletions will be made when an original recording is copied, noting, for example, that "unimportant, irrelevant, prejudicial, privileged and/or confidential material should be removed." *Taylor*, 2011 IL 110067, ¶ 44. Additionally, "the more important criteri[on] is that the edits cannot affect the reliability or trustworthiness of the recording. In other words, the edits cannot show that the recording was tampered with or fabricated." *Id.* The court noted that most editing will not render the evidence inadmissible but, rather, will go to the weight of the evidence. *Id.*

¶ 68    To the extent defendant argues that the court should not have allowed the recording to go back to the jury, this argument is forfeited, as defendant's arguments below challenged foundation, not the propriety of allowing the jury to have the recording, portions of which it had already heard.[7] In any event, a recording may, in the court's discretion, be employed in the jury room. *People v. Manuel*, 294 Ill. App. 3d 113, 126 (1997). Here, where the court properly admitted the recording as substantive evidence and the jury heard portions of the recording during the trial, we find no abuse of discretion in permitting the recording, at the jury's request, to go to the jury room.

¶ 69    In sum, the court did not abuse its discretion in admitting the recording as substantive evidence. Pannell, a witness to the recorded events, was present to testify to the accuracy of the recording, and additional factors demonstrated its reliability. Further, any alleged flaws in chain of custody, quality, etc., go to the weight of the evidence, not admissibility.

¶ 70                                    C. Transcript

¶ 71    Next, defendant argues that the trial court erred where it permitted the jury to "rely heavily" on the transcript as an aid. Defendant argues that the transcript was unauthenticated and inaccurate. For the following reasons, we disagree that the court's decision–to allow the jury to review the transcript while the recording was played in court–was an abuse of discretion.

¶ 72    It is proper "for a trial court to permit the jury to use written transcripts of recorded conversations in order to assist them while they listen to the conversations." *People v. Rogers*, 187 Ill. App. 3d 126, 132 (1989). In *Rogers*, the court found no error in the trial court's decision to permit the jury to review transcripts while listening to an audio recording, as: (1) the court admonished the jury that the transcripts were not evidence; (2) the court collected the transcripts from the jurors after they listened to the recording; and (3) the witness-informant who was present for the conversations testified that she listened to the tapes, that she helped prepare the transcripts, and that the transcripts were accurate. *Id.* at

---

[7]As to the fact that only portions of the recording were played, but the entire recording went back to the jury, we note that, in argument, the State informed the court that, if defendant objected to this manner of proceeding, it would play the entire recording in court. Defendant did not object. Further, there is nothing in the record to indicate that, if defendant on cross-examination had wished to play additional portions of the recording, he would not have been permitted to do so.

132-33. The court in *Rogers* found that the aforementioned facts distinguished the case from *People v. Melchor*, 136 Ill. App. 3d 708 (1985), the primary case upon which defendant relies here, because in *Melchor* there was no testimony establishing the authenticity of the transcripts *or* the identities of the speakers on the tapes; further, because there was no evidence identifying the speakers on the recording, the transcripts, without any authentication, were the only method of linking the defendant to the crime. In contrast, the *Rogers* court held, the problem in *Melchor* was not present in the case before it, because the informant's testimony authenticated the transcripts and identified the speakers on the tapes. *Rogers*, 187 Ill. App. 3d at 133. Finally, the court rejected the defendant's arguments that there was reversible error because of inaccuracies in the transcripts. *Id.* at 133-34. The court acknowledged one point where the informant's testimony differed from the transcripts, and that the informant denied making a statement as reflected in the transcripts. *Id.* However, it found no prejudice, because the informant testified to her own independent recollection, the jury listened to the tapes, and the distinction was brought to the jury's attention. *Id.* at 134. Further, although the court found in its own review of the tapes and transcripts other minor inaccuracies, they were not so severe as to prejudice the defendant or establish error in the trial court's decision to permit the jury to use the transcripts. *Id.*

¶ 73    Here, we are presented with a set of facts more similar to *Rogers* than to *Melchor*. Although the State represented that it did not prepare the transcript–rather, the FBI prepared the transcript when it produced the recording–it was for this very reason (coupled with the fact that some portions of the transcript appeared in a bolded font) that the court *denied* the State's request to admit the transcript into evidence.[8] Instead, the court: (1) held that the jury could use the transcript only as a guide, with the recording being the evidence; (2) admonished the jury that the transcript was only a guide; (3) collected the transcript from the jurors after they heard the recording; and (4) denied the jury's request for the transcript during deliberations. We agree with the court in *People v. Spicer*, 61 Ill. App. 3d 748, 759 (1978), *rev'd on other grounds*, 79 Ill. 2d 173 (1979), that the better practice is for the trial court to admonish the jury of the purpose of the transcript (*i.e.*, to aid only) *and* to admonish the jury that it is to determine for itself the events transpiring on the tape. Nevertheless, like in *Rogers*, Pannell, a witness to the events recorded, was present at trial to both review the transcript and identify the speakers on the recording. Defendant makes much of Pannell's comment that, at one point, the transcript did not accurately reflect what was on the recording. However, in context, it is apparent that, in his cross-examination (and after having listened to several portions of the recording), defendant identified only one point where the *transcript* appeared to differ from Pannell's *testimony* on direct examination. Pannell then noted that, to explain the discrepancy, he would need to hear that portion of the recording. Upon doing so, Pannell explained that there was an error in the transcript, in that it appeared

_____

[8]We caution that we do not condone the use of transcripts with only portions printed in bolded font, and that the better practice is to use a clean copy. As explained below, however, the use of the transcript here was not an abuse of discretion where Pannell was available to review the transcript and was subjected to cross-examination regarding its accuracy, and where the jury was not permitted to retain the transcript.

to show only one person as making a statement when, in fact, the comments were made by two different people. Thus, the alleged inaccuracy was explained to the jury, and the jury was free to accept or reject that explanation.

¶ 74    As the jury was instructed that the transcript was to be used only as a guide, Pannell identified the speakers on the recording, and the only alleged inaccuracy was explained by Pannell, we do not find error in the court's decision to permit the jury to use the transcript as a guide.[9]

¶ 75                              D. Sufficiency of Evidence

¶ 76    Finally, defendant argues that the State failed to prove beyond a reasonable doubt that he fired a shot at Ramos. He notes that Ramos testified that the assailant wore a black, hooded sweatshirt, while Pannell testified that defendant wore a white, hooded sweatshirt. Defendant notes that the only testimony reflecting that he fired a gun came from Pannell, who was a paid informant facing harsh consequences were he to have been involved in any illegal activity. Meanwhile, he argues, Ramos testified only that he saw a person, dressed like Pannell, raise his hand, and then he heard a "pop," and, thus, the evidence was insufficient to sustain defendant's conviction. For the following reasons, we reject defendant's sufficiency argument.

¶ 77    When reviewing the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000). We will not substitute our judgment for the trier of fact's and will not reweigh the evidence. *Id.* at 431. It is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences therefrom. *Id.*

¶ 78    Here, the evidence was sufficient to sustain the jury's verdict. Both Camacho and Tellner identified defendant from a photograph. Pannell testified that defendant was in the car with him, that defendant exited the vehicle after spotting Ramos, an alleged member of a rival gang, and that defendant then issued driving directions to a location where he could "ambush" Ramos. When they arrived at the location to which defendant directed them, defendant exited the vehicle and waited between two homes until Ramos appeared. At that time, Pannell saw defendant raise his hand and shoot at Ramos. When he returned to the vehicle, defendant commented that he had tried to kill Ramos, but kept hearing "click, click, click," and that later, because he had fired the weapon, defendant showered to wash off any gunshot residue. Pannell described the foregoing events for the jury, and the jury then heard

_____

[9]We note that this court cannot listen to the recording to compare it with the transcript, as the parties agree that the recording, as presented in the record on appeal, was inexplicably damaged such that it is inoperable. Further, although two copies of the recording were produced to defendant, one original and one "enhanced," it appears (although is not specified) that the "enhanced" version was played and made part of the record. The record does not reflect, however, the location or condition of the original recording.

the recording of those events. This evidence, viewed in the State's favor, is sufficient to uphold the jury's finding that defendant shot at Ramos.

¶ 79　　As to defendant's challenge to Pannell's credibility on the basis that Pannell was a paid informant with a violent criminal history and an interest in cooperating with the State, we note that defense counsel thoroughly brought that information to the jury's attention. We further note that the jury had the unique opportunity to ascertain Pannell's credibility simply by listening to Pannell's voice in person, and then comparing his voice to the voices it heard on the recording. It was within the province of the jury to compare Pannell's voice and description of events to the voices and events it heard on the recording and to weigh and draw inferences from that evidence. In addition, the jury was instructed that it should view Pannell's testimony with suspicion and caution and carefully examine it in light of the other evidence. Accordingly, we will not disturb the jury's decision to credit Pannell's testimony.

¶ 80　　As to the varying descriptions of the shooter's appearance, we note that, according to Hornback, Ramos told him on the day of the event that the shooter was dressed primarily in black, with a white, hooded sweatshirt. Pannell also testified that defendant wore a white, hooded sweatshirt and, at the time of the shooting, a black bandana over his face. At trial, Ramos testified that the shooter wore a black, hooded sweatshirt. However, he also testified that he was not paying attention "at all" to what the person was wearing, that he "just glanced over," and that the person's head was covered such that he could not see his face. This description is not inconsistent with Pannell's description of defendant's face being covered in black. Further, Ramos testified that the shooter was heavyset and likely weighed around 230 pounds. The jury saw Pannell in person and heard him testify that he weighed around 135 pounds. Thus, viewing the evidence in the State's favor, the jury could have rejected defendant's suggestion that Pannell was the shooter, and, instead, could have credited the evidence that defendant shot at Ramos.

¶ 81　　Finally, defendant suggests that there was no shooting, because Ramos testified to hearing a "pop," and no weapon, bullets, or casings were found. Ramos, however, also testified that he saw a gun, and that he knew that the sound he heard was a gunshot because he had heard gunshots before. Again, it was the jury's function to weigh the evidence and draw inferences therefrom. In sum, we reject defendant's arguments.

¶ 82　　　　　　　　　　　　　　　III. CONCLUSION

¶ 83　　For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 84　　Affirmed.