2022 IL App (2d) 210148-U
No. 2-21-0148
Order filed January 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-2138 |
| DARNELL A. YOUNG, | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State proved beyond a reasonable doubt that defendant committed aggravated discharge of a firearm, despite the lack of physical evidence. Eyewitnesses observed defendant shoot a firearm at the victim and recognized, from experience, the sounds as gunshots (the discharge of a projectile). (2) The trial court did not err in the challenged evidentiary rulings and any errors were harmless given the overwhelming evidence of guilt.

¶ 2    Following a bench trial, defendant, Darnell A. Young, was convicted of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)) and sentenced to 93 months' imprisonment. He appeals, contending that (1) he was not proved guilty beyond a reasonable doubt and (2) evidentiary errors by the trial court deprived him of a fair trial. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      At trial, Marzell Taylor-Young testified that, on September 22, 2018, at about 5 p.m., she and defendant, her husband, were in front of their home on Elim Avenue. They were discussing divorce. Because it was raining, Taylor-Young commented about rolling up the windows in the Nissan they jointly owned. She recalled that she "tried to take the car or something" and that defendant "was trying to get the keys or something." When defendant "got up," she saw a silver .38-caliber revolver in his hand. She recognized it as a revolver because she owned "a pink one." When she saw the gun in defendant's hand, she turned and ran away. As she was running, defendant fired three shots. She testified that she did not remember defendant saying anything to her and that she could not see the direction in which he was firing because she was running away. As she ran, a neighbor pulled her into his house and called the police.

¶ 5      Taylor-Young acknowledged that she wrote a statement at the police station on the day of the incident. The prosecutor showed her the statement to refresh her recollection. She acknowledged writing that, as she was running, she heard defendant say, " 'I'm going to blow your brains out.' " She also acknowledged writing that defendant "pulled out a gun and begin [*sic*] shooting at me" and, further, that defendant "started shooting at me in the middle of the street."

¶ 6      Kerry Rawlins, a retired police officer, testified that he lived at the intersection of Elim Avenue and 31st Street where the incident occurred. He was unloading groceries from his car when he heard two "gunshots." He turned and saw defendant (whom he recognized from the neighborhood) standing in the middle of Elim Avenue. Defendant was holding a gun pointed in the direction of a woman.

¶ 7      Justin Ruesch also lived near that intersection. As he was in the living room with his family, he heard a "gunshot." He got his family into the bathroom, then went to the window that

faces Elim Avenue. He saw defendant (whom he recognized from the neighborhood) on Elim Avenue pointing a gun at a woman who was running north on Elim Avenue. Defendant was wearing black, red, and white "Blackhawks colors." Ruesch "saw a gun up in the air and heard a bang." Ruesch, an "avid shooter," was certain that the "bang was the sound of a gunshot." As the woman ran past his yard, he quickly pulled her into the house and called the police.

¶ 8 Irene Mucha lived in the neighborhood at the time of the incident. She saw a man with dreadlocks walking down the street around dinner time. He was holding a bag and taking off his sweatshirt, which he threw into a garbage can. Later that day, Mucha told a neighbor "about the man with the dreadlocks that put his sweater in a garbage can." Mucha also spoke with a detective. She "told [the] detective the same thing" to which she had testified. She also pointed out to the detective "the residence where [she] saw the garbage can."

¶ 9 Sergeant Paul Kehrli testified that he received a report of shots fired at an address where the police had "had previous contact." Over defense objection, he testified:

> "We knew to be keeping an eye out for what was going on there. We were familiar with the subject who lived there. So when we heard shots fired there, it was obviously concerning to us. It was serious. It wasn't just—it wasn't just fireworks that went off, it was an address that we usually go to. So I responded out there with other patrol officers. I believe the whole shift went."

¶ 10 Kehrli explained that with a revolver, such as the one defendant allegedly used, shell casings remain in the weapon after it is fired. Kehrli testified that the police did not find any bullets or bullet damage in the area. He noted that .38 caliber bullets or bullet holes would have been difficult to find because of their relatively small size and the rainy weather on the day of the incident.

¶ 11    Describing the evidence as "overwhelming," the court found defendant guilty and sentenced him to 93 months in prison.  Defendant timely appeals.

¶ 12                                    II. ANALYSIS

¶ 13    Defendant first contends that he was not proved guilty beyond a reasonable doubt. Specifically, he contends that no one saw him fire the gun in Taylor-Young's direction.  He also notes that no one witnessed the gun discharge a bullet and that police found no shell casings, bullets, or bullet damage at the scene.

¶ 14    When considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *People v. Smith*, 185 Ill. 2d 532, 541 (1999) (citing *Jackson v. Virginia,* 443 U.S. 307 (1979)).  To convict defendant of aggravated discharge of a firearm as charged here, the State had to prove that defendant "discharge[d] a firearm in the direction of another person."  720 ILCS 5/24-1.2(a)(2) (West 2018)). "Discharge" means "causing the ammunition projectile to be forcefully expelled from the firearm." *Id.* § 720 ILCS 5/2-15.5.

¶ 15    Defendant argues that the State failed to prove that he discharged the weapon "in the direction of" Taylor-Young.  We disagree.

¶ 16    An independent eyewitness, Ruesch, testified unequivocally that he saw defendant shoot at Taylor-Young.  Ruesch stated that he saw defendant pointing a gun at a woman who was running north on Elim Avenue.  He saw the gun "up in the air and heard a bang."  His testimony was corroborated by Rawlins, who stated that he heard gunshots, then turned to see defendant pointing a gun in the direction of a woman.  It is reasonable to infer that, upon hearing gunshots in the street

in front of his house, Rawlins turned immediately and saw defendant before he had time to move the gun from the direction in which he had been firing.

¶ 17    The State also points to Taylor-Young's testimony, claiming that she testified that defendant threatened her and shot at her. She initially testified that she did not remember defendant saying anything to her and that she could not see the direction in which he was firing because she was running away. However, she acknowledged that, in a written statement to the police on the day of the incident, she claimed that defendant threatened to " 'blow [her] brains out,' " shot "at" her, and then, after she turned to run, continued firing.

¶ 18    Thus, there were two eyewitnesses—Ruesch and Taylor-Young herself—who directly observed defendant shoot in Taylor-Young's direction. Their accounts were corroborated by a third eyewitness (Rawlins), who, it can be reasonably inferred, saw defendant pointing the gun in Taylor-Young's direction immediately after he fired.

¶ 19    We stress that, even if we discount Taylor-Young's testimony about her written statement—to which defendant did not object—we would reach the same conclusion. The testimony of Ruesch and Rawlins was sufficient to establish that defendant shot at Taylor-Young. See *People v. Harris*, 2018 IL 121932, ¶ 27 ("[T]he testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted.").

¶ 20    Defendant contends, however, that it is a "virtual impossibility" that Ruesch could have seen defendant fire a shot. He notes that Ruesch ushered his family into the bathroom after hearing gunfire and only then went to look out the window. However, there was no evidence of the interval between shots or of how long it took Ruesch to get his family to safety. Defendant's argument that Ruesch could not have seen defendant shooting is sheer speculation.

¶ 21    Defendant further contends that there was no evidence that he fired a projectile at Taylor-Young. He argues that no one testified to seeing a bullet leave the gun and that the police never found a gun, shell casings, bullets, or any evidence of property damaged by bullets near the scene.

¶ 22    Taylor-Young, Ruesch, and Rawlins all testified that defendant wielded a real gun. Taylor-Young owned a revolver herself. Ruesch and Rawlins, both very familiar with firearms, were certain that the sounds they heard were "gunshots." "Gunshot" is defined as a "shot or projectile fired from a gun." Merriam-Webster's Collegiate Dictionary 518 (10th ed. 2001). Thus, the trial court could reasonably infer that defendant fired live rounds.

¶ 23    In *People v. Montes*, 2013 IL App (2d) 111132, we rejected that defendant's similar argument. There, the defendant was convicted of aggravated discharge of a firearm. He contended that the evidence that he fired live rounds was insufficient because no weapon, bullets, or casings were found and the victim testified only that he heard a " 'pop.' " *Id.* ¶ 81. However, we noted the victim's further testimony that he knew the sound he heard was a gunshot because he had heard gunshots before. We held that this testimony alone supported the conviction despite the lack of physical evidence. *Id.*

¶ 24    Here, both Ruesch and Rawlins were familiar with firearms and both testified that they heard gunshots. Per *Montes*, the lack of physical evidence is not fatal to the State's case. We note that Kehrli largely explained the lack of such evidence. He testified that a revolver does not expel casings and that .38 caliber bullets or bullet holes would be difficult to locate because of their size and the weather conditions.

¶ 25    Defendant next contends that evidentiary errors deprived him of a fair trial. We disagree.

¶ 26    Defendant argues that the trial court improperly allowed the State to bolster Mucha's testimony with prior consistent statements. After describing how she saw a man discard clothing

in a trash can, she was allowed to testify that she told a friend what had happened and that she "told the detective the same thing."

¶ 27    Generally, a witness's prior consistent statement is inadmissible solely to bolster his or her trial testimony. However, a prior consistent statement is admissible to rebut a charge that the witness is motivated to testify falsely or that his or her in-court testimony is a recent fabrication. Ill. R. Evid. 613(c) (eff. Sept. 17, 2019); *People v. Tisdel*, 201 Ill. 2d 210, 216-17 (2002). Defendant contends that, because Mucha's credibility was not questioned, no reason existed to bolster her credibility by revealing that she had previously told others the same story. The State responds that her testimony that she told the same story on the day of the incident was offered not for its truth but for the permissible purpose of showing why the police searched a trash can more than a mile from the crime scene.

¶ 28    Regardless of whether Mucha's testimony was relevant for some legitimate purpose, any error in its admission was harmless beyond a reasonable doubt. As defendant notes, Mucha's credibility was not challenged. Thus, while it was not necessary to bolster her credibility—assuming that this was done—doing so was harmless. The trial court would have been no more likely to reject her testimony had it not known that she previously told others "the same thing."

¶ 29    Moreover, Mucha's testimony was not probative of any contested issue in the case. The offense occurred during an apparent quarrel between defendant and his wife; the shooter's identity was never at issue. At trial, as on appeal, defendant never really disputed that he brandished a weapon during an argument with his wife. He contested only whether he fired live rounds in her direction. In its closing argument, defense counsel all but conceded that defendant was guilty of the lesser charges of reckless discharge of a firearm and aggravated assault. Thus, defendant likely was conscious that he was guilty of *some* offense, but disposing of his sweater did not imply

knowledge that he was guilty of the precise offense of which he was convicted. Mucha's testimony made it neither more nor less likely that defendant fired shots in Taylor-Young's direction.

¶ 30    Finally, defendant contends that the trial court erred in admitting Kehrli's testimony that the police were familiar with defendant's house and were "keeping an eye out for what was going on there." Defendant argues that the inference of prior police contact improperly suggested that he was guilty of other crimes.

¶ 31    Evidence regarding other crimes is generally inadmissible to demonstrate a propensity to commit the charged crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Such evidence is admissible, however, to prove intent, *modus operandi,* identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case. *Donoho*, 204 Ill. 2d at 170. The State responds that Kehrli's testimony that the police were aware of "what was going on" at defendant's house was vague and did not specifically accuse defendant of other crimes—and that, even if it did, the evidence was properly admitted to show the antagonistic relationship between defendant and his wife. See *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 43 (prior violence against the victim admissible to show that the defendant is likely to do further violence).

¶ 32    In any event, any error in admitting this testimony was harmless. The trial court described the evidence that defendant shot at Taylor-Young as "overwhelming." Three eyewitnesses, including Taylor-Young, testified to defendant pointing a gun in her direction. Taylor-Young wrote in a statement that defendant threatened to " 'blow [her] brains out.' " Two men familiar with firearms described hearing gunshots. It is highly unlikely that the trial court was unpersuaded by this evidence and instead found defendant guilty on the basis that the police were "keeping an eye" on defendant's house because of some unspecified prior activity.

¶ 33                                III. CONCLUSION

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 35    Affirmed.