# Illinois Official Reports

## Appellate Court

---

### *People v. Montes*, 2015 IL App (2d) 140485

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AUGUSTINE T. MONTES, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0485 |
| Filed | February 6, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the summary dismissal of defendant's postconviction petition claiming actual innocence based on entrapment and ineffective assistance of counsel arising from defendant's convictions *in absentia* for attempted first-degree murder and aggravated discharge of a firearm, the appellate court affirmed defendant's convictions and the summary dismissal of his postconviction petition, since entrapment was not available as a defense where defendant denied committing that offense and defendant's absence from the trial precluded his counsel from meeting his obligation to discuss the availability of a lesser-included-offense instruction with defendant and whether there was a reasonable probability that submission of such an instruction could change the result. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 05-CF-2797; the Hon. Robert K. Villa, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Matthew J. Haiduk, of Geneva, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Sally A. Swiss, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel    JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial *in absentia*, defendant, Augustine T. Montes, was convicted of attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2004)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2004)). He was sentenced to 26 years' imprisonment for attempted murder and a concurrent 10-year term for aggravated discharge of a firearm. On direct appeal, we affirmed defendant's conviction. *People v. Montes*, 2013 IL App (2d) 111132.

¶ 2    Thereafter, defendant, with assistance of counsel, filed a postconviction petition pursuant to section 122-1 of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2012)). Defendant raised claims of actual innocence, based on entrapment, and ineffective assistance of counsel. The trial court summarily dismissed the petition, and defendant appeals. For the reasons that follow, we affirm.

¶ 3                       I. BACKGROUND

¶ 4    We provide a summary of the trial evidence here; a more detailed recitation of the evidence may be found in our prior decision. *Montes*, 2013 IL App (2d) 111132, ¶¶ 1-48. Further, we again note that defendant was not present at his trial.

¶ 5    On November 22, 2005, at around 12:30 p.m., Julian Ramos was walking to his girlfriend's house in Aurora when he saw four people in a green Pontiac Bonneville pass him. One person exited the vehicle, and Ramos began to run. At some point, he turned around and saw someone about 35 to 40 feet away pointing a gun at him. The person wore a black, hooded sweatshirt and was heavyset (approximately 230 pounds). Ramos saw a gun and then turned around and heard shots fired. He screamed "I ain't no King," and he continued running and climbed into a truck to hide.

¶ 6    At the time of the shooting, Blake Pannell was working for the FBI as an informant. Pannell, who had committed several serious crimes and who was serving as the "enforcer" for the Aurora Latin Kings street gang, testified that he was with defendant, Quentin Moore, and Ruben Hernandez on the day of the shooting. Pannell testified that he was wearing a

recording device given to him by the FBI. Moore drove the men in his green Pontiac Bonneville, and they went to spray paint over graffiti that rival gangs had painted in Latin King territory. According to Pannell, defendant noticed a man on foot (Ramos) whom he believed to be a member of the Insane Deuces, a rival gang. The men began plotting how to catch up with the man to shoot him; Pannell, however, testified that he was not plotting, because he was working with the government. Moore parked in an alley so that defendant could get out of the car and catch up with Ramos. Hernandez gave defendant the gun, and Pannell, Moore, and Hernandez stayed in the car while defendant exited. When defendant returned to the car, he related that, when Ramos noticed him coming with his hood up, Ramos got scared and ran off. Defendant said that he knew exactly where Ramos was heading, and he then instructed Moore on how they could drive to catch up with him. Defendant wanted to get to a location and park, so that they could ambush Ramos when he arrived.

¶ 7 Defendant wiped the gun with a towel, threw it on the backseat, and put the towel over it. Pannell, sitting on the other side, reached over and, through the towel, pushed a button on the gun to remove the clip; he dragged the clip out and stuffed it between the seat cushions. Pannell explained that he did not know if a bullet was still in the gun's chamber; by removing the clip he removed any other bullets. He did so because he did not want anyone killed. When they arrived at the second location, defendant grabbed the gun, put it in his sweatshirt pocket, and exited the vehicle. Pannell saw defendant stand between two houses until Ramos appeared.

¶ 8 At that point, Pannell's cell phone, which was located in the same area as the gun clip, began to ring. When Pannell reached to pick up his phone, he noticed that Hernandez was looking back at him. Pannell thought that Hernandez saw the clip, so he grabbed it and said "[defendant] doesn't have the clip." Hernandez told Pannell to go give it to defendant, in case Ramos had a gun and tried to open fire on defendant. Pannell exited the car while Hernandez began trying to call defendant to let him know that he did not have the clip. About the same time, Ramos appeared, and defendant came out and fired at him. Pannell heard the gunshot and saw defendant fire. Pannell, holding the clip, started running across the street toward defendant, calling defendant's name. Ramos was running away, screaming, "I'm not a King, I'm not a King, I'm not a King." Pannell met up with defendant and said to him, "you have no clip, you have no clip," and they ran back to the car.

¶ 9 When they got inside the car, defendant said, "I almost had him. I almost had him." Hernandez said to defendant, "you better finish this since he's seen us. You better kill that person." They began driving to find Ramos, and defendant was going to "just gun him down." As they neared a busy street, they saw that Ramos had stopped traffic and was in the middle of the street. Because there were several vehicles stopped on a major road, they abandoned their pursuit of Ramos and left to hide. They went to a friend's home where they smoked marijuana, defendant showered, and they waited for time to pass. Later, Pannell was dropped off at another friend's house. He called his FBI contact and gave her the recording.

¶ 10 Portions of the recording were played for the jury, and a transcript was provided to the jury to assist it while listening to the recording. Pannell identified voices on the recording. For example, at one point someone on the recording, whom Pannell identified as defendant, spotted Ramos and said "he's a Dukie," a derogatory slang word for an Insane Deuce. Pannell identified a voice that said "Damn, then he'll see my face" as defendant's voice. He

identified a voice that said "You want a bandana" as Hernandez's. He also identified a voice that said "You look like a bank robber" as his own. Pannell explained that, when defendant got out of the car the second time, after originally seeing Ramos, he wore over his face a black bandana that Hernandez had handed to him. Once he put it on, one could see only defendant's eyes and part of his forehead. Otherwise, defendant's face just appeared black. Pannell identified defendant's voice as saying, "Take a left. I know exactly how to catch him up ***." Pannell identified and explained additional portions of the recording, including when defendant exited the vehicle, the sound of the gunshot, the sound of his own running as he got back into the car with defendant, and defendant saying "I had to bump that 'nigga'" (which means kill him), "it was all over for him," "I was chasin', chasing down the block," and "I kept hearin' click, click, click." Pannell explained that he could be heard yelling defendant's name (Augustine) and then Hernandez said "Come on hurry up. Give him the clip, Give him the clip." Then Pannell opened the door and started running, yelling "Augustine" as he jumped out of the car. Pannell identified the point in the recording when they pulled up at their friend's house and exited the car, the sound of the car doors, and the sound of defendant's voice asking if he could take a quick shower. Pannell testified that he weighed a little less than 135 pounds at the time of the incident. Defendant, in contrast, was a "much bigger guy."

¶ 11    The jury returned a verdict of guilty on both counts and signed a special interrogatory, finding that defendant personally discharged the firearm. The court denied defendant's posttrial motions and sentenced him to 26 years' imprisonment for attempted murder and 10 years' imprisonment (concurrent) for aggravated discharge of a firearm. We affirmed, holding that: (1) defendant was sufficiently admonished that trial could proceed *in absentia* if he did not appear; (2) sufficient foundation existed to admit the audio recording; (3) the court did not abuse its discretion in permitting the jury to use a transcript of the recording; and (4) the evidence was sufficient to establish that defendant shot at Ramos. *Montes*, 2013 IL App (2d) 111132, ¶¶ 57, 69, 74, 81.

¶ 12    On January 29, 2014, defendant, through counsel, filed his postconviction petition, raising three issues. First, defendant raised a claim of actual innocence. He alleged that evidence became available after trial that would have supported an entrapment defense. Specifically, defendant attached an affidavit from Hernandez that essentially alleged that, in contrast to his trial testimony, Pannell was the driving force behind the shooting. According to Hernandez's affidavit, Pannell, working as a government agent and using his influence as gang "enforcer," gave defendant a gun and told him to watch for rival gangs. Hernandez told defendant that Pannell had said that he thought that defendant had not yet "proved himself" and that defendant might be beaten or killed. When a man from another gang walked by, Pannell "gesture[d]" to the group to follow; defendant left the car to pursue the man, but subsequently returned when the man got away. According to Hernandez, "Pannell does or says nothing to prevent the situation from escalating[,] but encouraged it." They came across the individual again and tried to park to let defendant out of the car. Hernandez turned around and saw defendant trying to conceal the clip of ammunition in the seat cushions. When defendant subsequently exited, Pannell noticed that defendant did not take the clip. To avoid raising Pannell's suspicions, Hernandez yelled at Pannell to take the clip to defendant. Pannell left the car with the clip, and a single shot was fired. "I didn't know if [defendant] fired the shot ***." According to Hernandez's affidavit, Pannell "induced and incited" the

incident by possessing a firearm and putting everyone in a position to commit a crime. "That was Pannell['s] intention from the beginning ***." Pannell placed defendant "in a horrible predicament" where backing out might have cost him his life. Further, Pannell played his role as enforcer to the "extreme" by providing guns, participating in crimes, imposing punishment, and "influencing violence." Finally, Hernandez attested in the affidavit, "I was unavailable at the time, but I'm available to testify if needed."

¶ 13    In addition, defendant attached an affidavit from his trial attorney, Timothy Mahoney, attesting that it was his understanding that Hernandez faced criminal charges in "several cases" and was unavailable to be interviewed or called as a defense witness.

¶ 14    Defendant next alleged in his petition that trial counsel was ineffective for not discussing with him his right to seek a lesser-included-offense jury instruction, specifically on the offense of reckless discharge of a firearm (as a lesser included offense of aggravated discharge of a firearm). Defendant alleged that the evidence supported the instruction, since Ramos testified that he ran for a "good second" before hearing a single gunshot, and Ramos did not know "what direction the shots were fired at him." Defendant attached Mahoney's affidavit attesting that at no point prior to or during trial did he discuss with defendant the possibility of asking for a lesser-included-offense jury instruction. Further, to counsel's knowledge, defendant was not informed by counsel or the court of his right to seek a jury instruction on a lesser included offense.

¶ 15    Finally, defendant alleged that trial counsel was ineffective for not seeking on his behalf a plea deal from the State.[1]

¶ 16    On April 29, 2014, the trial court summarily dismissed defendant's postconviction petition. Regarding defendant's actual-innocence claim, the court found that: (1) the affidavits failed to establish with supporting facts that Hernandez was unavailable such that his testimony could be considered newly discovered; and (2) the trial evidence, even absent Hernandez's testimony, was such that defense counsel could have presented an argument that defendant was ordered to act by an FBI informant, and therefore Hernandez's testimony was not new, noncumulative evidence that was so conclusive that it would probably change the result on retrial. Regarding defendant's ineffective-assistance claim premised on the lesser-included-offense instruction, the court found that it failed because: (1) defendant forfeited the issue by not raising it on direct appeal; (2) defendant failed to attach his own affidavit asserting that he would have demanded the submission of a lesser-included-offense instruction; and (3) defendant failed to establish that any error prejudiced him. Defendant appeals.

¶ 17                                    II. ANALYSIS

¶ 18    "In a postconviction proceeding, the trial court does not redetermine a defendant's innocence or guilt, but instead examines constitutional issues which have escaped earlier review." *People v. Jones*, 399 Ill. App. 3d 341, 356 (2010). The postconviction setting does not act as a substitute for or an addendum to a direct appeal. *Id.* At the first stage (as here) for adjudicating a postconviction petition, the trial court considers, without input from the State, whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2)

---

[1]Defendant abandons this claim on appeal and, therefore, we do not address it further.

- 5 -

(West 2012). A claim is frivolous or patently without merit where it has no "arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacking an arguable basis in law or in fact is one "based on an indisputably meritless legal theory" or a fanciful factual allegation. *Id.* Where the petition's allegations are contradicted by the record or are fantastic or delusional, the petition should be dismissed. *Id.* at 16-17. We review *de novo* the dismissal of a postconviction petition at the first stage. *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 19    Defendant argues first that the trial court erroneously dismissed his actual-innocence claim, because Hernandez's affidavit supports an arguable entrapment defense. We disagree. Defendant has forfeited an entrapment defense. See *People v. Fleming*, 50 Ill. 2d 141, 144 (1971) (an entrapment defense must be raised at trial or it is forfeited). Further, as discussed below, the entrapment defense contemplates that a defendant was induced to act by a government agent; therefore, the defense is unavailable to a defendant who denies committing the offense. *Id.* Here, defendant did not list entrapment as a defense in his discovery answers, nor did he appear at trial to admit to the shooting or to raise the entrapment defense. Trial counsel did not, in defendant's absence, raise entrapment as a defense, nor could he without defendant's consent, as the defense required defendant to admit to the offense. Defendant has never raised an ineffective-assistance claim that trial counsel failed to present an entrapment defense. On direct appeal, defendant did not raise entrapment, and he has not alleged ineffectiveness by appellate counsel for failing to raise the claim on direct appeal. Accordingly, we conclude that defendant's attempt to raise entrapment *for the first time* in a postconviction setting must fail. The entrapment defense is forfeited. See also *People v. Davis*, 2014 IL 115595, ¶ 13 (in a postconviction setting, issues that were raised and decided on direct appeal are barred by *res judicata*, while issues that could have been raised on direct appeal, but were not, are forfeited).

¶ 20    We could end our analysis there. However, we suspect that defendant would respond that he could not have raised the entrapment defense at trial, because the evidence supporting that defense, *i.e.*, Hernandez's testimony, was unknown and unavailable at the time of trial. It is purportedly for that reason that defendant seeks postconviction relief, styling his claim as one of actual innocence based on newly discovered evidence supporting an entrapment defense. For the following reasons, we conclude that, even if the entrapment defense was not forfeited, defendant's postconviction actual-innocence claim was nevertheless properly dismissed as an indisputably meritless legal theory.

¶ 21    Postconviction petitioners may assert a claim of actual innocence only where the basis of that claim stems from newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). A court should grant relief only where the petitioner presents supporting evidence that is new, material, noncumulative, and, critically, of a character so conclusive that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 84. Further:

> "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *Id.* ¶ 96.

An actual-innocence claim is "extraordinarily difficult to meet," and courts of review rarely grant postconviction relief. *Id.* ¶ 94 (noting that only three reported cases had granted actual-innocence postconviction relief since 1996).

¶ 22 Finally, as to entrapment, the Criminal Code of 1961 provides:

"A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense." 720 ILCS 5/7-12 (West 2004).

Thus, to establish an entrapment defense, a defendant must show both that the State induced him to commit the crime *and* that he or she was not already predisposed to commit it. *People v. Placek*, 184 Ill. 2d 370, 380-81 (1998).

¶ 23 We first reject defendant's assertion that the information in Hernandez's affidavit is new. Initially, we note that it is not clear that Hernandez's testimony was unavailable at the time of trial and could not have been discovered through due diligence. It is true that Hernandez's affidavit stated broadly that he was unavailable. However, neither Hernandez's nor Mahoney's affidavit set forth *facts* establishing that Hernandez was unavailable. The affidavits did not assert that Hernandez was a codefendant in this case. Mahoney's affidavit stated only that he understood that Hernandez faced charges in "several cases." It did not state that he tried to interview Hernandez and that, in fact, Hernandez would not speak with him. Moreover, nowhere in his affidavit did Hernandez state that, if he had been called to testify at defendant's trial, he would have invoked his fifth-amendment rights, thus rendering him unavailable.

¶ 24 In any event, we acknowledge that this is only the first stage of postconviction proceedings. Therefore, even if we were to overlook the absence of facts supporting unavailability and accept that Hernandez was unavailable at the time of defendant's trial, it remains that the factual basis for the alleged entrapment defense is not new.

"Usually, to qualify as new evidence, it is the *facts* comprising that evidence which must be new and undiscovered as of trial, in spite of the exercise of due diligence. Generally, *evidence is not 'newly discovered' when it presents facts already known to the defendant at or prior to trial*, though the source of those facts may have been unknown, unavailable, or uncooperative." (Emphases added.) *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007).

Here, we are not presented with a situation where the basis for the affirmative defense remained undiscovered until after trial. See, *e.g.*, *People v. Alberts*, 383 Ill. App. 3d 374, 385 (2008) (postconviction claim of actual innocence based on involuntary intoxication proper where the law changed subsequent to the defendant's trial, allowing for the defense to be applied to unwarned side effects from prescribed medication); see also *People v. Hoban*, 2014 IL App (1st) 121540-U (actual-innocence claim proper where the defendant learned after his conviction that he had psychotropic side effects from an allergy medication that he was taking at the time of the crime). In contrast, defendant here knew prior to trial the facts that he alleges would support an entrapment defense, *i.e.*, that Pannell was an informant, that Pannell gave him the gun, that Pannell encouraged the crime, and that he, defendant, was fearful that he would be beaten or killed if he did not comply. Defendant focuses solely on

the fact that certain evidence from Hernandez, arguably showing that he was entrapped, was allegedly unavailable, but he ignores that *he* could have elected to appear at his own trial to testify to his entrapment defense. Certainly, a defendant's failure to take the stand cannot be held against him. However, a postconviction actual-innocence claim requires new information or evidence *discovered after trial* that could not have been discovered earlier through the exercise of due diligence. As defendant knew the necessary facts prior to trial, the information in Hernandez's affidavit might have lent additional support to that claim, but it is not new.

¶ 25     Next, the information in Hernandez's affidavit is not conclusive such that, when considered along with the trial evidence, it would probably lead to a different result. If introduced at trial, Hernandez's testimony would have cast doubt on the version of events to which Pannell testified. Hernandez's testimony is not *conclusive* evidence of defendant's innocence; rather, it simply contradicts trial testimony. See *People v. Collier*, 387 Ill. App. 3d 630, 637 (2008) (noting that evidence that merely contradicts or impeaches a witness is typically not of such a conclusive nature so as to justify postconviction relief and, moreover, that the hallmark of actual innocence is a defendant's total vindication or exoneration). Further, even with Hernandez's testimony that Pannell induced defendant to act, the postconviction petition contained no affidavit or even allegations that would establish the second half of the entrapment defense, *i.e.*, that defendant, a Latin Kings gang member, was not predisposed to commit the crime. Finally, it is critical to again note that entrapment is unavailable as a defense where the defendant denies committing the offense. *Fleming*, 50 Ill. 2d at 144. Here, as defendant did not admit to the crime at trial, his postconviction petition failed to allege or attest that he committed the shooting, and Hernandez's affidavit stated only that he did not know if defendant was the shooter, defendant is precluded from raising entrapment as a defense. Accordingly, as it is indisputably meritless, the postconviction claim of actual innocence based on entrapment was properly dismissed.

¶ 26     Defendant challenges next the dismissal of his claim that trial counsel was ineffective for failing to discuss whether he, defendant, wanted the jury instructed on the lesser included offense of reckless discharge of a firearm. At the first stage of postconviction proceedings, an ineffective-assistance-of-counsel claim may not be dismissed if it is arguable that: (1) counsel's performance fell below an objective standard of reasonableness (performance prong); *and* (2) the defendant was prejudiced (prejudice prong). *Hodges*, 234 Ill. 2d at 17 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). The performance prong requires us to consider whether, applying a strong presumption that counsel's representation fell within the wide range of reasonable assistance (see *Strickland*, 466 U.S. at 689), there is an arguable basis to find that counsel's performance was "objectively unreasonable under prevailing professional norms." (*People v. Cathey*, 2012 IL 111746, ¶ 23). The prejudice prong requires us to ask whether there is an arguable basis to conclude that there exists a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* The failure to satisfy either prong will defeat the ineffective-assistance claim. *People v. Williams*, 193 Ill. 2d 306, 375 (2000).

¶ 27     Here, defendant correctly notes that only he could decide whether to submit an instruction on a lesser charge. See *People v. Brocksmith*, 162 Ill. 2d 224, 229-30 (1994) (it is the defendant's decision, at the close of the evidence, whether to submit an instruction on a lesser charge). It is for that very reason that defendant's absence from trial leads us to

conclude that there is no arguable basis to find that counsel's performance fell below prevailing professional norms. Counsel is accused of ineffectiveness for failing to discuss with defendant whether to submit to the jury a lesser-included-offense instruction, but defendant was not present at trial for counsel to do so. Counsel could not submit a lesser-included-offense instruction without the opportunity to discuss it with defendant and without defendant's consent. *Id.* at 230. Thus, by absenting himself from trial, defendant precluded counsel from fulfilling the obligation to discuss with him the availability of a lesser-included-offense instruction.

¶ 28    Further, defendant's postconviction claim also fails to establish an arguable basis for concluding that there exists a reasonable probability that, if counsel had discussed with him a lesser-included-offense instruction, the result of the proceeding would have been different. Defendant did not allege that, if counsel had done so, defendant would have elected to submit the instruction. Accordingly, defendant's postconviction petition was properly dismissed.

¶ 29                                    III. CONCLUSION
¶ 30    For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 31    Affirmed.